Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: TANYA ARNOLD

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TANYA ARNOLD, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>ROCKET COMPANIES, INC., a Delaware corporation; ROCKET LIMITED PARTNERSHIP, a Michigan limited partnership; ROCKET MORTGAGE, LLC, a Michigan limited liability company,<br><br>Defendants. | Case No: 5:25-cv-01887-SPG-AS<br><br>**SECOND AMENDED COMPLAINT**<br><br>1. Cal. Penal Code § 638.51<br><br>**CLASS ACTION** |

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought by Plaintiff on behalf of herself and on behalf of all California residents who have accessed www.rocketmortgage.com (the "Website").

2. Plaintiff TANYA ARNOLD files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendants, ROCKET COMPANIES, INC., a Delaware corporation, ROCKET LIMITED PARTNERSHIP, a Michigan limited partnership, ROCKET MORTGAGE, LLC, a Michigan limited liability company. Plaintiff brings this action based upon personal knowledge of the facts pertaining to her, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

3. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

4. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

5. When users visit the Website, Defendants cause tracking technologies to be installed, executed, embedded, or injected in visitors' browsers. These include, but are not limited to, the following:

- Google Ads / DoubleClick Tracker
- Facebook PixelTracker
- Snapchat Tracker

6. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data

monetization strategies that go beyond Defendants' direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

7. The Trackers are operated by distinct third parties: Google LLC (Google Ads / DoubleClick Tracker), Meta Platforms, Inc. (Facebook Pixel Tracker) and Snap Inc. (Snapchat Tracker). Defendants enable these trackers, which transmit user data to their respective third-party servers to identify users and support targeted advertising, user profiling, and data monetization within each platform's advertising ecosystem.

8. Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and/or geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

9. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

10. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using the Trackers without prior consent and without a court order, Defendants violated CIPA § 638.51.

11. On information and belief, in addition to the trackers identified above, the Website deploys numerous other third-party tracking, analytics, advertising, optimization, session-replay, and identity-synchronization technologies without consent or a court order, including but not limited to the Microsoft Bing Ads tracker,

the TikTok Analytics tracker, the Pinterest tracking pixel, the Reddit tracking pixel, the Yahoo Analytics tracker, the Rubicon/Magnite ID-sync tracker, the OpenX real-time bidding and ID-sync tracker, the InMobi identity-sync tracker, the Dotomi/Epsilon identity-matching tracker, the Lotame audience-sync tracker, the ContextWeb/Conversant tracker, the FreeWheel user-sync tracker, the Tremor/DAX media-exchange tracker, The Trade Desk tracker, the Tapad identity-resolution tracker (operated by Tapad, Inc., a California-registered data broker), the Optimizely experimentation tracker, the Glassbox session-replay tracker, the Segment tracking and routing system, the Amplitude analytics tracker, and the LivePerson session-tracking module. These technologies collect, record, capture, or transmit dialing, routing, addressing, signaling, device, and transactional information associated with users' interactions with the Website, including device identifiers, session identifiers, timing parameters, user-agent and client-hints fields, cross-site identifiers, and event-level metadata, thereby functioning as digital pen-register or trap-and-trace devices as defined by Penal Code § 638.50.

12. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendants violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

13. Plaintiff brings this action to prevent Defendants from further violating the privacy rights of California residents.

14. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

15. Plaintiff TANYA ARNOLD ("Plaintiff") is a California citizen residing in Riverside County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period prior to the filing of the complaint in this matter. The allegations set forth herein are based on the Website as configured when Plaintiff visited it multiple times including but not limited to July 2,

2025 to inquire about mortgage-rates, loan calculators, loan-term comparisons, home-buying guidance, and first-time homebuyer resources, among other things.

16. Defendants have a privacy policy that can be found on the Website; Plaintiff never agreed to it or consented to its terms. At no point did Plaintiff provide any form of prior consent—express, implied, actual, or constructive—for Defendant to deploy Google, Meta, Snapchat, or any other third-party trackers on her device. The Website did not display any standalone consent prompt, click-through agreement, or interstitial notice requiring Plaintiff to agree to tracking before her communications were intercepted. Plaintiff did not click on, open, read, or assent to any Privacy Policy or Terms of Use hyperlink before the transmissions occurred, nor did she have actual knowledge of their content. Any link to a privacy policy was buried in small, passive footer text that required scrolling and affirmative searching to locate. Because Plaintiff never took any action indicating agreement, and because the Website initiated the transmissions automatically at the moment the homepage loaded, Defendant lacked the "prior consent of the user" required under § 638.51(b)(5), rendering each interception unlawful.

17. Defendant ROCKET COMPANIES, INC. is a Delaware corporation with its principal executive offices in Detroit, Michigan (hereinafter "Rocket Companies"). Rocket Companies is the publicly traded parent entity that exercises oversight and centralized control over the Rocket family of companies, including Rocket Limited Partnership and Rocket Mortgage, LLC. On information and belief, Rocket Companies develops and governs the enterprise-wide digital infrastructure, privacy practices, and data-collection systems used across the Rocket ecosystem, including those implemented on the Website.[1]

/ / /

---

[1] Rocket's SEC Form 10-K: https://www.sec.gov/Archives/edgar/data/1805284/000180528422000011/rkt-20211231.htm (last visited 12-2-25).

18. Defendant ROCKET LIMITED PARTNERSHIP (formerly known as "RKT Holdings, LLC" and "Rocket, LLC") (hereinafter "Rocket Limited") is, on information and belief, a limited partnership organized under the laws of the State of Michigan with its principal place of business in Detroit, Michigan. Rocket Limited is the operating entity that owns and operates the Website, governs Rocket Account Services, and manages the broader "Rocket" digital ecosystem.

19. Defendant ROCKET MORTGAGE, LLC is, on information and belief, a Michigan limited-liability company with its principal place of business at 1050 Woodward Avenue, Detroit, Michigan (hereinafter "Rocket Mortgage"). On information and belief, Rocket Mortgage is a wholly owned operating subsidiary of Rocket Limited and is the consumer-facing mortgage entity whose products, tools, and pages Plaintiff accessed during her Website visit.

20. Rocket Mortgage participates in, benefits from, and jointly controls the deployment and use of tracking, analytics, and advertising technologies on the Website, including the technologies that collected and transmitted Plaintiff's browsing activity, device information, and page-level behavioral data to third parties without her consent.

21. On information and belief, Rocket Mortgage is and at all relevant times has been licensed by the California Department of Financial Protection and Innovation under the California Residential Mortgage Lending Act to engage in residential mortgage lending and related activities with California consumers. Through this license, Rocket Mortgage routinely originates, underwrites, and services mortgage loans secured by residential real property located in California for California residents.

22. Rocket Limited is responsible for Website operations including, on information and belief, deploying, maintaining, configuring, and supervising the Website's data-collection architecture, including the third-party tracking technologies, analytics scripts, and routing mechanisms at issue in this action, and does so for the benefit of itself, Rocket Mortgage, and Rocket Companies.

/ / /

23. On information and belief, in originating and servicing these California mortgage loans, Rocket Mortgage works with California-based counterparties, including but not limited to title companies, escrow companies, appraisers, and closing agents, and routinely directs California borrowers and prospects to the Website to obtain rate quotes, submit applications, manage their loans, and communicate with Rocket personnel. These California-centered lending relationships are continuous and systematic, not isolated or fortuitous.

24. Defendants Rocket Companies, Rocket Mortgage and Rocket Limited are referred to hereinafter collectively as the "Defendant" or as "ROCKET."

25. ROCKET operates one of the largest integrated mortgage and financial-technology ecosystems in the United States. Through this enterprise structure, ROCKET offers mortgage-origination services, loan-servicing functions, real-estate search tools, financial-management products, and related digital resources. Its primary online presence is the consumer-facing Website, which is owned and operated by Rocket Limited Partnership and used by ROCKET collectively to promote its services, interface with consumers, and direct users into various Rocket-branded platforms and affiliated business lines.

26. The Website functions as ROCKET's flagship digital platform and a central hub for its online operations. In addition to facilitating mortgage applications, account access, loan management, and service inquiries, the Website continuously collects, processes, and disseminates user data associated with browsing behavior, device characteristics, page-level interactions, and consumer engagement. Acting jointly and through shared infrastructure, ROCKET implements the tracking technologies, analytics tools, and data-routing systems embedded on the Website. These data-collection practices support ROCKET's business objectives, including customer acquisition, lead generation, personalized digital experiences, advertising optimization, cross-platform analytics, and ongoing consumer communications.

/ / /

27. Plaintiff is informed and believes that ROCKET exercises centralized and enterprise-wide control over the digital infrastructure, privacy architecture, consent-management systems, tracking stack, advertising integrations, and audience-data vendors used across all Rocket-branded consumer platforms, including the Website; the ROCKET subsidiaries including Rocket Limited and Rocket Mortgage do not maintain independent privacy, tracking, or consent configurations; instead, they operate under the uniform digital framework and technical governance implemented and enforced by Rocket Companies.

28. On information and belief, Rocket Companies designs, oversees, and maintains the enterprise-wide digital framework for the Website's consent flows, geolocation-based residency identification, audience-segment integrations, and ad-tech vendor relationships, and deploys materially uniform configurations across Rocket's consumer-facing properties. Rocket Companies and its subsidiaries share common branding, an integrated digital platform, centralized data systems, and coordinated privacy and tracking operations, such that the Website functions as part of a single, integrated enterprise controlled by ROCKET.

29. Rocket Companies implements, governs, and enforces uniform privacy, tracking, consent-management, and vendor-integration configurations across all Rocket-branded digital properties, including the Website. On information and belief, neither Rocket Limited nor Rocket Mortgage maintains independent tracking or consent configurations; instead, each follows the enterprise-wide framework set and controlled by Rocket Companies, such that all three entities operate as a single, integrated platform for purposes of data collection and privacy practices.

30. Rocket Companies' enterprise-wide privacy disclosures explain that Rocket automatically collects device and usage information from visitors to its Websites, including users' IP addresses, device identifiers, and network information, as well as information regarding the precise location of a user's device when permitted by device settings. Rocket classifies "precise geolocation" as a form of "Sensitive Personal

Information" under applicable state privacy laws and lists California among the states whose residents receive these statutory privacy rights. On information and belief, Rocket uses IP-based and other geolocation information to determine users' physical locations and states of residence, including whether a visitor is accessing the Website from within California.[2]

31. On information and belief, when users access the Website from California IP addresses or navigate to California-specific pages on the Website, ROCKET's uniform tracking and consent framework causes the same third-party tracking, analytics, and advertising technologies identified herein to be installed, executed, embedded, or injected in their browsers. ROCKET does not disable, segregate, or materially alter this tracking stack for California sessions; instead, it continues to route California visitors' page-level interactions, device characteristics, and navigation signals to the same network of commercial tracking, analytics, and audience-data systems described herein.

## III. JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

33. Paragraphs 34 through 39 below set forth the basis for this Court's personal jurisdiction over the Defendants.

34. When Plaintiff accessed the Website from within California, Defendant caused her browser to transmit her page-level interactions, device characteristics, and navigation signals to a network of commercial tracking, analytics and audience-data systems that are designed, configured, and marketed for use with California residents

[2] The Website's March 5, 2025 Privacy Notice: https://www.rocketcompanies.com/privacy (last viewed 12/2/25).

and that maintain physical interconnection and data-processing infrastructure within California. Defendant's acquisition, analysis, and monetization of California residents' mortgage-shopping data is a standard, routine, and revenue-generating business practice—not an incidental or isolated occurrence.

35. During the same session, Defendant caused Plaintiff's browser to transmit her interactions to advertising and analytics systems that maintain documented physical infrastructure and interconnection presence in California. These included Google's DoubleClick (doubleclick.net) operating over AS15169, which publicly maintains peering and interconnection points at Equinix Los Angeles and Equinix San Jose internet exchanges.[3] The Website also triggered calls to Meta's advertising and analytics systems (facebook.com) operating over AS32934, which publicly peers at CoreSite LA1, Digital Realty Los Angeles, Equinix Los Angeles and/or the Equinix San Jose Internet Exchange, where Meta maintains a 100-Gbps port.[4] Microsoft's Bing infrastructure (AS8075) likewise maintains California interconnection presence.[5] These facts show that Defendant knowingly selected vendors whose infrastructure and interconnection points are used to ingest and process communications from California users; the allegations do not assert that any individual packet traveled through any specific cage or switch.

36. On information and belief, Plaintiff's interactions were also transmitted to a set of programmatic advertising exchanges and audience-data intermediaries, including Index Exchange (casalemedia.com / 1rx.io), PulsePoint/ContextWeb

---

[3] PeeringDB — Google AS15169 showing public peering at Equinix Los Angeles and/or Equinix San Jose internet exchanges: https://www.peeringdb.com/net/433.

[4] PeeringDB — Meta AS32934 showing California presence at CoreSite LA1, Digital Realty LA, Equinix Los Angeles and Equinix San Jose internet exchanges: https://www.peeringdb.com/net/979

[5] PeeringDB — AS8075 showing California interconnection presence at CoreSite – Los Angeles (LA1) and LA3, Equinix LA1 (Los Angeles), Digital Realty LAX (600 W 7th), plus public peering at Equinix Los Angeles and Equinix San Jose IXes: https://www.peeringdb.com/net/694

(contextweb.com), Magnite/Rubicon (rubiconproject.com), Eyeota (eyeota.net), Sharethrough (sharethrough.com), Smart AdServer (smartadserver.com), and Tremor (tremorhub.com). Public documentation confirms that these vendors maintain California internet-exchange presence and offer California-specific demographic, contextual, interest-based, and mortgage-intent audience segments designed to target California residents.[6] Index Exchange appears in PeeringDB with documented peering at Equinix Los Angeles.[7] Eyeota and Magnite publicly market California-derived segments sourced from California browsing activity and purchased specifically to reach California consumers. Defendant's selection of these vendors reflects deliberate use of ad-tech systems designed to ingest, model, and activate California behavioral data.

37. Defendant knew and expected that a substantial portion of traffic to the Website would come from California residents. Defendant is licensed to originate and service residential mortgage loans in California and, on information and belief, consistently originates and services billions of dollars in mortgage loans on California properties each year. Defendant also publishes California-specific content on the Website, including pages addressing 'average mortgage payments in California'[8] and 'essential home-buying resources'[9] for California residents, which are designed to attract California homebuyers and drive them into Defendant's online application and lead-generation flows.

/ / /

---

[6] Eyeota — U.S. state-level audience segments (including California) available via the Eyeota Audience Marketplace:https://www.eyeota.com/

[7] PeeringDB —Index Exchange Inc. (AS54073) showing public peering at the Equinix Los Angeles IX: https://www.peeringdb.com/net/2042

[8] Link to Rocket website for California details: https://www.rocketmortgage.com/learn/average-mortgage-payment-california?utm_source=chatgpt.com (last viewed 12/2/25).

[9] Link to Rocket website for California details: https://www.rocketmortgage.com/learn/essential-home-buying-resources-california?utm_source=chatgpt.com (last viewed 12/2/25).

38. Defendant's deliberate selection and integration of advertising and analytics vendors that maintain documented interconnection and data-processing infrastructure in California and that market California-specific demographic, interest, and mortgage-intent audience segments reflects intentional use of ad-tech systems designed to ingest, model, and monetize California users' mortgage-shopping data as part of Defendant's routine revenue-generating business practices, rather than incidental exposure of communications to the internet backbone.

39. Because Rocket Companies determines and governs the Website's privacy, tracking and data-routing architecture and its subsidiaries implement and rely on that unified architecture, the California contacts arising from the Website's operation are properly imputed to Rocket Companies, Rocket Limited, and Rocket Mortgage for purposes of personal jurisdiction.

40. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

41. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

42. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

43. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

44. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

45. In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

46. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

47. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

48. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

49. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be

construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

50. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

51. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (See *Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).)

52. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

53. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.* what images to load, what text should appear, or what music should play.

54. In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's

IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

55. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**




56. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

57. The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are

used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

58. Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

59. An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[10]

60. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

61. Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the

[10] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

62. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

63. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

64. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

65. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

66. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router

directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[11]

**Figure 2:**




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

67. Thus, the differences between public and private IP addresses are as follows:[12]

/ / /

/ / /

[11] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[12] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br>10.0.0.0 – 10.255.255.255,<br>172.16.0.0 – 172.31.255.255,<br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

68. A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

69. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

70. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

/ / /

71. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[13]

72. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[14]

73. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[15] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[16] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[17] because "[c]ompanies can use an IP address … to personally identify individuals."[18]

74. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where

---

[13] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[14] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[15] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[16] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[17] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[18] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

they are, where they have been, and what kinds of products or services will appeal to their needs."[19] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[20]

75. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[21]

76. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[22]

77. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[23] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[24]

78. In addition, "IP address targeting can help businesses to improve their

---

[19] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[20] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[21] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[22] *Id.*

[23] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[24] *Id.*

overall marketing strategy."[25] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[26]

79. The collection of IP addresses here is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[27]

80. In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

81. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[28]

---

[25] *Id.*

[26] *Id.*

[27] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[28] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION,

82. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[29]

83. Often times, third-party scripts are installed on websites "for advertising purposes."[30]

84. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[31]

85. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

86. As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

87. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is

---

https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

[29] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[30] *Id.*
[31] *Id.*

associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

88. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

89. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

### 3. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting*

90. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

91. The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent

identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

92. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

93. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

94. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

/ / /

95. In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

96. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

97. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4. *Plaintiff And Class Members' Data Has Financial Value***

98. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[32]

[32] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

99. Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[33]

100. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[34]

101. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[35]

102. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how

---

[33] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[34] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[35] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[36]

103. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[37]

104. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

105. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

106. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the

[36] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[37] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

107. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

108. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

109. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's

awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

***6. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

110. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

111. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

112. To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

113. In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

/ / /

/ / /

**a. Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

114. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[38] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

115. Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). Here, Defendant has implemented the Tapad Tracker on the Website; Tapad, Inc. is a registered California data broker.

116. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[39] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[40]

117. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been

[38] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

[39] SHERMAN, *supra*, at 2.

[40] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[41]

118. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[42] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[43]

119. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[44]

120. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

---

[41] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[42] SHERMAN, *supra*, at 1.
[43] *Id.*
[44] *Id.* at 9.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many
>
> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[45]

121. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[46]

/ / /

/ / /

/ / /

/ / /

[45] *Id.*

[46] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 4:**


DATA BROKERS AND THE INDUSTRY OF DATA
Social media
Personal information
Games and entertainment
Warranty checks
Online activity
Medical records
GPS location
Coupons
Transactions
Communication
Website registrations
Submits data
Apps
Stores
Companies
Governments
Data brokers
Websites
Banks
DATA BROKERS
Trading
Scraping
Sharing
PRODUCTS
Personal profiles
Original lists
Segments
Look-alike models
Scores
Appends
USE
Marketing
Advertisement
Customer management
Business analysis
Risk analysis
Shared datasets
BLACK MARKET DATA BROKERS
Hacking
Leaking
Stealing
PRODUCTS
Personal profiles
Fullz
Exploit kits
Card data
Medical histories
Passports
Passwords
USE
Criminal activities
Targetting
Fraud/scam
Manipulation
RISKS AND VULNERABILITIES
General issues and risks
Violation of Privacy
Data collected and used without consent by user
Potentially harmful inferential data
No transparency with regards to what data is kept on a user and for what reason
No control over who obtains personal data
Advertisement and manipulation
Unwanted advertisement
Political manipulation via targeted ads
Misuse of personal data
Data exposure
Lacking security of the data broker
Exposure of personal information
Criminal activities
Explotation
Spam
Phishing attacks
Identity theft
Scams
Potential risk to military organisations
Personnel
Extortion / black mail / dioxing
Manipulation of behaviour or opinion
Impersonation or identity theft
Intelligence gathering / surveillance
Equipment
Exposure of device IDs
Mapping of communication patterns
Credit card theft
Intelligence on equipment
Activity
Mapping or tracking of personnel movement
Geo-localisation of ops or exercises
Disruption of activities
Information
Information theft via for example spear phishing
Exposure of sensitive information such as lists of personnel etc.
Data leaks / hacks
Facilities
Geo-localisation of sensitive or secret facilities
Identification of personnell working in specific facilities
Access to facilities via impersonation

/ / /

/ / /

122. As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[47]

123. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[48]

124. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[49]

125. In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

126. As a result of Defendant's installation of the trackers of data brokers such as Tapad and many of the entities the Third Parties sync with on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses Device Metadata, and User Information (or new profiles are created for Plaintiff and Class Members).

---

47 *Id.* at 11.

48 Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https:// www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

49 Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

127. These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

128. Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

129. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[50]

130. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the Trade Desk is[51]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[52] And an Advertising Exchange "allows advertisers and publishers to

[50] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[51] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").

[52] *Id*.

use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[53]

131. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like Trade Desk help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

132. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[54]

/ / /

/ / /

/ / /

---

[53] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[54] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 5:**




133. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[55]

/ / /

/ / /

[55] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

**Figure 6:**




134. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

135. Likewise, a DSP like Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

136. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

137. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

a. "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

b. "send[ing] sensitive data across geographic borders."

c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[56]

138. Given Trade Desk operates a DSP here, the last point is particularly relevant, as it means Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

139. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[57]

140. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[58]:

/ / /

/ / /

/ / /

[56] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[57] Geoghegan, *supra*.

[58] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

**Figure 7:**




141. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

142. It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like Tapad who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share

information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

143. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[59] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[60]

144. Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user*. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web*.[61]

---

[59] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[60] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

[61] Papadopoulos, *supra*, at 1433.

**Figure 8:**




145. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[62]

146. On the flip side, "CSync may re-identify web users even after they delete their cookies."[63] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[64] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's

[62] Papadopoulos, *supra*, at 1434.
[63] *Id.*
[64] *See id.*

browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[65]

147. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[66]

148. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website (*e.g.*, Experian, Epsilon, TransUnion, the Third Parties between one another). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Website.

149. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

150. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website

[65] *Id.*
[66] *Id.* at 1441.

(*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

151. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

152. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

153. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

154. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

/ / /

155. Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

156. The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

157. The Trade Desk performs identity enrichment and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in identifier syncing across advertising networks, these entities create detailed, persistent user profiles that extend beyond a single browsing session or device. The Trade Desk utilizes frameworks like Unified ID 2.0 to map users across domains. These practices convert raw behavioral data collected on the Website into monetizable, targetable audience segments within the programmatic advertising ecosystem.

### 7. *The Trackers Function Together to Achieve Targeted Objectives*

158. When a user visits the Website, a suite of background tracking technologies is silently activated upon initial page load. These include client side scripts (Trackers) deployed by Google Ads and DoubleClick, Facebook Pixel and SnapChat Pixel, all of which begin collecting user information immediately and without visible

notice. These technologies work together to form a coordinated data collection infrastructure that allows ROCKET and its marketing partners to observe user behavior in real time. The information collected is used to optimize marketing campaigns, segment audiences, and enhance targeting precision for digital advertising initiatives.

159. On information and belief, these third-party trackers operate as part of a large scale, interconnected digital advertising ecosystem. Entities such as Google, Meta (Facebook) and Snapchat utilize shared identifiers, cookie syncing, and cross device recognition technologies to follow users across disparate websites, devices, and platforms. These tools are specifically designed to enable persistent identity resolution and real time behavioral targeting, facilitating the construction of detailed consumer profiles at scale.

160. On the Website, these trackers are embedded either directly in the site's HTML source or are dynamically loaded via JavaScript during runtime. Google Ads and DoubleClick and the Facebook Pixel are triggered immediately upon landing on the homepage. Simultaneously, tracking requests from SnapChat's Pixel, which are also initiated with no gating or opt in mechanism. These technologies collect a variety of data points including IP address, device configuration, browser characteristics, and on site interactions and transmit them to third party servers. Their joint purpose is to enable downstream advertising activities, identity correlation, and behavior based audience monetization.

161. Identity resolution on the Website is primarily enabled through the interplay of Facebook and SnapChat tracking tools. The Facebook Pixel associates website activity with logged in Facebook user sessions and stored cookies, allowing Meta to build cross context behavioral profiles. SnapChat's tracking endpoint captures user engagement and potentially device level attributes to enable lookalike modeling and campaign retargeting. These integrated mechanisms enable ROCKET and its partners to de anonymize site visitors over time and associate browsing behavior with real world identities and demographic attributes.

162. Once identity signals are collected, targeted advertising and audience segmentation are executed via platforms such as Google Ads and DoubleClick. Google's ad stack engages in real time programmatic auctions, delivering personalized ad creatives based on inferred intent, user demographics, and conversion signals. The SnapChat Pixel contributes to dynamic audience building and conversion tracking across devices. Together, these systems allow ROCKET and its advertising partners to monetize visitor behavior, optimize campaign performance, and deliver highly specific ad content across channels.

163. ROCKET shares user information with third party advertising platforms, particularly DoubleClick (a division of Google), that operate real time bidding systems. Upon visiting the website, data such as the user's IP address, browser type, page URL, and device details are transmitted to Google's ad infrastructure without any affirmative user action. These identifiers allow advertisers to follow users across the web, profile their behavior, and serve personalized ads in real time. Critically, this data exchange occurs immediately, without consent, and before the user can review or manage privacy preferences.

164. On investigation of counsel, ROCKET is participating in a programmatic advertising infrastructure that supports real time ad bidding and conversion tracking. These data transfers enable advertisers to compete for ad impressions based on a user's digital footprint, increasing the value of each visitor to the Website. Importantly, these requests serve no functional benefit to the user. They exist solely to enable ROCKET and its partners to extract commercial value from personal data. The silent activation of these trackers at page load transforms sensitive user information into a marketable asset for advertising return.

***8. Defendant Shared Plaintiff's Personal Behavioral Data with Third Parties***

165. During her visit to the Website, Plaintiff viewed multiple Website pages, including the homepage and additional mortgage-shopping pages she accessed while researching. These pages contained mortgage-rate information, loan-term comparisons,

first-time-homebuyer guidance, and educational material concerning the mortgage-application process. As Plaintiff navigated these pages, Defendant caused her browser to automatically transmit the full URLs, page titles, and identifying metadata associated with each pageview—including the fact, nature, and subject matter of the content she was reviewing—to multiple third-party tracking and advertising companies such as Google, Meta, and Snapchat. These transmissions occurred in real time during her pageviews and without her knowledge or consent.

166. Defendant's Website disclosed Plaintiff's mortgage-shopping activity to Google and DoubleClick through analytics and advertising scripts that transmitted data reflecting which categories of mortgage-rate pages, loan-comparison resources, and home-buying articles she viewed, along with device characteristics and session identifiers that allowed Google to link her sequential pageviews into a unified behavioral profile. Through these transmissions, Google learned the specific mortgage-related materials Plaintiff reviewed and could associate that activity with its existing behavioral advertising segments.

167. Defendant also caused Plaintiff's device to transmit her mortgage-shopping pageviews to Meta, Pinterest, and Reddit. These companies received referrer information and session-level behavioral data revealing that a California visitor had accessed mortgage-rate content, loan-term comparisons, and first-time homebuyer resources on the Website. These disclosures enabled each of these third parties to classify Plaintiff's browsing behavior and incorporate her mortgage-related interests into their advertising, targeting, and modeling systems.

168. Plaintiff's mortgage-related pageviews were further disclosed to programmatic advertising and data-broker intermediaries, including Magnite/Rubicon, Dotomi/Conversant/Epsilon, InMobi, Tremor/Nexxen, Lotame, and other audience-matching services. These entities received behavioral signals identifying the categories of mortgage content Plaintiff viewed and device-level identifiers linking that activity to their persistent tracking or audience-profiling systems.

169. Additional third-party vendors—including Optimizely, LivePerson, and Amplitude—received information about Plaintiff's mortgage-related browsing when Defendant's Website triggered their scripts to load page-specific assets, optimization experiments, chat components, and behavioral-analytics instrumentation. These requests conveyed data sufficient to reveal the categories of mortgage content presented to Plaintiff, the page elements she interacted with, and the path she took through Defendant's mortgage-information modules.

170. Collectively, these transmissions show that Defendant disclosed to multiple third parties not only that a California resident visited the Website, but also the specific types of mortgage-related information she viewed, including mortgage-rate materials, loan-term comparisons, home-buying guidance, and first-time homebuyer resources. Defendant caused these disclosures automatically through embedded third-party tracking, analytics, advertising, and behavioral-modeling code that executed on Plaintiff's device without her knowledge or consent.

171. When Plaintiff navigated the Website and accessed mortgage-rate pages, first-time homebuyer guides, and other mortgage-shopping materials, the Website caused her browser to transmit the sequence of pages she viewed to multiple independent third parties, including Google (via googletagmanager.com, ade.googlesyndication.com, adservice.google.com), Meta (facebook.com), Reddit (alb.reddit.com), Pinterest (ct.pinterest.com, s.pinimg.com), Snapchat (tr.snapchat.com, tr6.snapchat.com), TikTok (analytics.tiktok.com), Yahoo (ups.analytics.yahoo.com), Bing/Microsoft (bat.bing.com), and OpenX/Magnite/Rubicon (us-u.openx.net, pixel.rubiconproject.com). These transmissions revealed the specific mortgage-information pages Plaintiff viewed, the order of her navigation, and/or the progression of her mortgage-shopping inquiries, thereby disclosing the contents of her Website activities to entities wholly outside of her knowledge.

172. The Website further caused Plaintiff's browser to disclose persistent device identifiers and session identifiers to third parties, including LivePerson

(va.v.liveperson.net), Segment (api.segment.io), Amplitude (through Segment), Optimizely (cdn.optimizely.com and a6147….cdn.optimizely.com), Glassbox (cdn.glassboxcdn.com), Dotomi/Epsilon (dp.crosspixel.net, dp-sync.dotomi.com), Lotame (lotame-match.dotomi.com), InMobi (sync.inmobi.com), FreeWheel (user-sync.fwmrm.net), and ContextWeb/Conversant (bh.contextweb.com). These identifiers—such as session IDs, visitor IDs, profile IDs, and long-term behavioral IDs—enabled the third parties to link Plaintiff's mortgage-related browsing to persistent behavioral profiles used for tracking, segmentation, and cross-site inference.

173. The Website also caused the disclosure of user-agent and client-hints fields revealing Plaintiff's device type, operating system, browser version, and configuration details to third parties including Google, Meta, Yahoo, Snapchat, TikTok, Reddit, Microsoft/Bing, Optimizely, Glassbox, Segment, and LivePerson. These fields enable third parties to uniquely fingerprint devices, associate specific mortgage-related browsing with a distinct user profile, and enrich pre-existing behavioral datasets.

174. The Website additionally caused Plaintiff's device to transmit cross-site identifiers used for audience matching and identity syncing to advertising exchanges and data-broker-connected entities, including InMobi (sync.inmobi.com), Dotomi/Epsilon (dp-sync.dotomi.com, lotame-match.dotomi.com), Magnite/Rubicon (pixel.rubiconproject.com), OpenX (us-u.openx.net), Tremor/The Trade Desk audio exchanges (partners.tremorhub.com, us-east.ads.audio.thisisdax.com), and ContextWeb (bh.contextweb.com). These identity-sync endpoints allowed third parties to merge Plaintiff's mortgage-shopping activity with existing behavioral, demographic, and interest-based profiles maintained outside of her relationship with the Website, thereby converting her confidential mortgage research into commercially valuable audience data.

175. The Website also disclosed timing parameters, engagement metrics, and session-activity information to third parties including Google, Optimizely, Glassbox, Segment, Amplitude, and LivePerson. These signals revealed how long Plaintiff spent

on particular mortgage pages, how she moved between them, and the specific content elements she interacted with. Such timing and engagement data allow third parties to infer Plaintiff's level of interest, decision-making process, and behavioral intent regarding mortgage products.

176. The disclosure of these data categories—page-level mortgage inquiries, navigation sequences, timing signals, device fingerprints, identity-sync identifiers, and session identifiers—to numerous independent analytics, advertising, and profiling entities constitutes the interception of Plaintiff's digital behavior without her consent. Each category reveals substantive information about Plaintiff's private mortgage-shopping behavior, financial interests, and home-buying research, and reflects what she viewed and how she interacted with the information.

177. These types of data are uniquely sensitive because they divulge not only that Plaintiff visited the Website, but also what she read, what subjects she explored, the sequence of her navigation, and the personal financial inquiries she made. By causing these third parties to receive Plaintiff's mortgage-related interests, session identifiers, and device characteristics without her knowledge or consent, Defendant enabled external entities to classify, profile, and monetize her private mortgage-shopping behavior, thereby intruding upon her reasonable expectation of privacy and exposing her needs, interests and preferences to analysis and commercial exploitation by recipients unknown to her.

## V. SPECIFIC ALLEGATIONS

### *1. Google Ads / DoubleClick Tracker*

178. The Google Ads / DoubleClick Tracker is a digital advertising, behavioral tracking, and data brokering technology operated by Google LLC. It is designed to deliver display advertisements, measure engagement, and support real-time bidding on programmatic ad exchanges. The Google Ads / DoubleClick Tracker enables Google and its advertising clients to collect detailed user interaction data and optimize ad delivery across a vast network of third-party websites.

179. When implemented on the Website, the Google Ads / DoubleClick Tracker collects a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and in-page activity data such as page views and navigation events. It also captures technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers placed via cookies or pixel fires that allow Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles. The Google Ads / DoubleClick Tracker also transmits conversion tracking signals and remarketing data, enabling Google to associate Website interactions with ad conversion events and to retarget users across its advertising ecosystem.

180. The Google Ads / DoubleClick Tracker facilitates monitoring of user activity on the Website, including the capture of pageview events and other engagement signals that can be used to track user progression through various transactional flows. These interaction signals are transmitted to Google's ad infrastructure to facilitate targeted advertising, audience retargeting, and conversion tracking. The Google Ads / DoubleClick Tracker executes via JavaScript calls to domains including googleads.g.doubleclick.net and activates automatically upon page load without requiring any action by the user.

181. The following figures [***Figure 9***, ***Figure 10*** and ***Figure 11***] provide technical evidence of the Google Ads / DoubleClick Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to external tracking domains. These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

182. Figure 9 shows Defendant automatically loading Google's tracking script (analytics.js) and immediately transmitting a Google Analytics "collect" request upon

the user's arrival on the homepage, without any user interaction or consent. The "collect" beacon sends to Google the user's IP address, the full URL of the Website page being viewed, referrer information, device and browser details, and timestamp data—all "dialing, routing, addressing, and signaling information" that CIPA § 638.50 defines as within the scope of a trap-and-trace device. By causing the user's browser to transmit this signaling and addressing data to Google in real time during page load, Defendant employs a prohibited trap-and-trace device under CIPA § 638.51 because it records and forwards the origin, destination, and addressing components of the user's electronic communication without her knowledge or authorization.

***Figure 9***




183. Figure 10 shows that, immediately upon loading the homepage, the Website triggers multiple tracking requests to adservice.google.com—a Google Ads/DoubleClick endpoint—without any user action or consent. Each gif request transmits the user's IP address, the full RocketMortgage URL being visited, timestamp data, and device/browser identifiers, which are the precise "dialing, routing, addressing, and signaling information" covered by CIPA § 638.50. By causing these Google Ads

beacons to fire automatically, Defendant enables Google to capture the origin and destination of the user's electronic communication in real time, evidencing the use of a prohibited trap-and-trace device under CIPA § 638.51.

***Figure 10***




184. Figure 11 shows that the Website triggers multiple DNS lookups to Google-owned domains—including android.clients.google.com, googletagmanager.com, fonts.googleapis.com, adservice.google.com, and google.com—immediately upon visiting the Website. Each DNS query transmits the user's IP address as the source of the request and resolves the destination Google servers that will receive subsequent tracking beacons. These DNS packets reveal the "origin, destination, addressing, and routing information" of Plaintiff's activities in real time, before any user interaction and without consent. This DNS-level evidence confirms that Defendant causes the user's device to establish communication pathways with Google for analytics and advertising tracking, thereby employing a trap-and-trace device in violation of CIPA § 638.51.

/ / /

***Figure 11***




185. Defendant surreptitiously installed, executed, embedded or injected the Google Ads / DoubleClick Tracker onto users' browsers by embedding tracking scripts in the Website's page source and by dynamically injecting additional JavaScript tracking code during runtime. When a user visits the Website, their browser automatically executes this code, which initiates outbound network requests to Google's advertising servers and transmits metadata including IP address, page URL, referrer information, device details, behavioral identifiers, and conversion tracking parameters as part of a third-party ad targeting, profiling, and data brokering system.

186. The Google Ads / DoubleClick Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

187. The Google Ads / DoubleClick Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

188. The Google Ads / DoubleClick Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures

outgoing signaling data such as URLs visited, timestamps, and referrer headers and also processes incoming metadata such as ad impressions and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader advertising profiles.

189. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Ads / DoubleClick Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

190. Consequently, the Google Ads / DoubleClick Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***2. The Facebook Pixel Tracker***

191. The Facebook Pixel Tracker is a behavioral tracking script implemented through Meta's Pixel technology, typically delivered via domains such as connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Pixel Tracker is injected through tag management infrastructure. Once loaded, it initiates background communication with Meta's servers and enables real-time tracking of user activity.

192. On the Website's homepage, the Facebook Pixel Tracker activates automatically upon page load and begins capturing behavioral data in real time. It records interaction signals such as page views and other engagement events without requiring any user action. The Facebook Pixel Tracker actively detects and collects additional user interaction, including click-based events and scrolling behavior. These signals are transmitted to Meta's servers and associated with the user's Facebook or Instagram profile, even if the user never directly interacts with any Meta service while on the Website.

/ / /

193. The data collected by the Facebook Pixel Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Facebook Pixel Tracker can tie Website behavior to the user's unique Meta ID. Even if not logged in, Meta can assign a persistent identifier using cookies, browser fingerprinting, or pixel fire data. This enables the creation of robust cross-site behavioral profiles based on a user's activity on the Website.

194. The Facebook Pixel Tracker also serves Defendant's goal of targeted advertising by enabling the creation of "Custom Audiences," groups of users who have taken specific actions on the Website, such as browsing listings, viewing product pages, or beginning a checkout process. ROCKET can then use Meta's Ads Manager to re-target those users across Facebook and Instagram, or to generate "Lookalike Audiences" that mirror the behavioral patterns of existing visitors. These mechanisms allow ROCKET to efficiently deliver marketing content to users most likely to engage or convert.

195. The Facebook Pixel Tracker contributes to ROCKET's data monetization strategy by turning behavioral insights into measurable advertising ROI. The Facebook Pixel Tracker generates real-time analytics regarding user behavior, campaign performance, and conversion attribution, which Meta then delivers to ROCKET through its Ads infrastructure. This closed-loop feedback system connects on-site engagement with off-site ad delivery, allowing ROCKET to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Facebook Pixel Tracker functions as a core part of ROCKET's commercial surveillance infrastructure.

196. The following figures [***Figure 12*** and ***Figure 13***] provide technical evidence of the Facebook Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to external tracking domains.

These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

197. Figure 12 shows that the RocketMortgage homepage automatically loads Meta's tracking script (fbevents.js) and initiates an outbound request to connect.facebook.net as soon as the page renders, without any user interaction or consent. The request to Meta's server transmits the user's IP address, the URL of the RocketMortgage page being viewed, timestamp information, device and browser details, and Facebook's assigned identifiers—precisely the "dialing, routing, addressing, and signaling information" encompassed by CIPA § 638.50. By causing these Meta Pixel resources to load automatically, RocketMortgage enables Meta to receive the origin and destination metadata of the user's electronic activities in real time, evidencing the use of a prohibited trap-and-trace device under CIPA § 638.51.

***Figure 12***




198. Figure 13 shows that simply loading the Website causes the user's device to perform DNS lookups for Meta-owned domains—including connect.facebook.net and www.facebook.com—automatically, without any user interaction or consent. These

DNS queries reveal the user's IP address as the source of the request, the destination Facebook servers that Defendant's code is directing the browser to contact, and the routing pathways establishing communication with Meta's tracking infrastructure. Because DNS requests contain the precise "origin, destination, addressing, and routing information" defined in CIPA § 638.50, this capture demonstrates that Defendant causes the user's device to initiate trap-and-trace signaling to Facebook in real time, evidencing the use of a prohibited trap-and-trace device under CIPA § 638.51.

***Figure 13***




199. Defendant surreptitiously installed, executed, embedded, or injected the Facebook Pixel Tracker onto users' browsers by dynamically injecting Meta's JavaScript pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

200. The Facebook Pixel Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

201. The Facebook Pixel Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

202. The Facebook Pixel Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata to Meta's servers as soon as the page loads, without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the Website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

203. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Pixel Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

204. Consequently, the Facebook Pixel Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***3. The Snapchat Tracker***

205. The Snapchat Tracker is a piece of software code that Defendant placed on the Website to share user interaction data and various Website events with Snapchat. This tracker enables the transmission of behavioral signals and technical metadata to Snapchat's tracking infrastructure, permitting Snapchat to monitor activity on the Website in real time and support the measurement and optimization of digital advertising campaigns.

206. The Snapchat Tracker uses pixel-based surveillance mechanisms to

collect and process user data on the Website as interactions occur. It monitors a range of events, including page views, button clicks, form submissions, and other engagement with site elements. This data is leveraged to analyze advertising effectiveness, facilitate behavioral targeting, and drive revenue by capturing and transmitting user information, including that of Plaintiffs and Class Members, to Snapchat's tracking systems.

207. The Snapchat Tracker begins collecting information immediately upon a user's arrival, gathering device and browser metadata, IP-based geolocation, HTTP referrer headers, and the URL of the page visited together with other User Information. This information is sent to Snapchat in real time using JavaScript-based tracking scripts. Snapchat's tracking technologies acknowledge the automatic collection of User Information, transmitting that information to Snapchat's servers without requiring any affirmative user action.

208. The following figures [***Figure 14*** and ***Figure 15***] provide technical evidence of Snapchat Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to external tracking domains. These network events occurred without any user interaction, confirming that the tracking technologies were operating silently in the background.

209. Figure 14 shows that the Website homepage automatically triggers multiple outbound tracking requests to Snapchat's tr.snapchat.com endpoint as soon as the page loads, without any user interaction or consent. Each "ping" request—initiated by Snapchat's scevent.min.js script—transmits the user's IP address, the Website URL being visited, timestamp information, and device/browser details. These Snapchat tracking pings capture and forward the precise "dialing, routing, addressing, and signaling information" defined under CIPA § 638.50. By causing the user's browser to contact Snapchat's servers in real time during page load, Defendant enables Snapchat to receive the origin and destination metadata of the user's electronic activities, evidencing Defendant's use of a prohibited trap-and-trace device under CIPA § 638.51.

*Figure 14*




210. Figure 15 shows that loading the Website homepage causes the user's device to automatically perform DNS lookups for Snapchat's tracking domains, including tr.snapchat.com and tr6.snapchat.com, before any user interaction and without consent. Each DNS query reveals the user's IP address as the source of the request and identifies the Snapchat servers that the browser is being directed to contact, disclosing the origin, destination, addressing, and routing information of the user's electronic communication. Because DNS queries inherently expose the signaling components defined under CIPA § 638.50, this packet-level evidence demonstrates that Defendant causes the user's device to initiate trap-and-trace signaling to Snapchat in real time, evidencing Defendant's use of a prohibited trap-and-trace device under CIPA § 638.51.

/ / /

/ / /

*Figure 15*




211. The collection of Plaintiff's and Class Members' personally identifying and non-anonymized information through Defendant's installation and use of the Snapchat Tracker constitutes an invasion of privacy and violates CIPA. Cal. Penal Code § 638.51(a).

212. The Website transmits tracking signals to Snapchat immediately upon page load and continues to initiate communications with Snapchat's servers when a user navigates between pages. These transmissions allow Snapchat to persistently track user activity across multiple areas of the Website during a single session.

213. The Snapchat Tracker facilitates identity resolution by collecting browser metadata, device identifiers, and behavioral signals from users' sessions on the Website. These data points including IP addresses, user-agent strings, session timing, and specific pageview events are transmitted to Snapchat's servers immediately upon page load.

214. Defendant surreptitiously installed, executed, embedded, or injected the Snapchat Tracker by deploying Snapchat's JavaScript tracking code through dynamic

injection on the Website. When a user visits the Website, their browser executes the script, which transmits data about the user's interactions including the user's IP address, page URL, and other metadata to Snapchat's servers. This communication occurs silently and automatically, without any user action or awareness.

215. The Snapchat Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

216. The Snapchat Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

217. The Snapchat tracker functions as a pen register or trap and trace device because it is designed to capture and transmit addressing, signaling, and routing information associated with a user's interactions on a website, including such information as page URLs, video identifiers, device and browser metadata, IP address, click paths, scroll depth, and session timestamps. This data reveals the origin and destination of electronic communications, closely analogous to how a traditional pen register captures dialed numbers and a trap and trace device records incoming call data. By systematically logging which content the user accessed (i.e., the "addressed" destination), the technical attributes of the user's system (i.e., the "signaling"), and the communication route (i.e., IP routing and timestamps), the Snapchat tracker enables TikTok to identify patterns of communication behavior, monitor content consumption in real time, and attribute it to specific individuals or devices.

218. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Snapchat Tracker on Plaintiff's and Class Members' browser or to collect or share data with Snapchat.

/ / /

/ / /

219. Consequently, the Defendant's secret installation of the Snapchat tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***4. The Trackers' Collection of Addressing, Routing and Signaling Metadata Is Not Merely Theoretical***

220. Fiddler Classic is an established forensic network-analysis tool that intercepts and records HTTP and HTTPS traffic in real time between a user's browser and external servers. Unlike static code inspection or assumptions about what tracking scripts are capable of collecting, Fiddler captures raw packet-level evidence of what is actually transmitted during a browsing session. Each logged request contains the full URL, headers, parameters, cookies, and payload data sent to third-party endpoints, allowing investigators to see exactly which identifiers, metadata, and behavioral signals are transmitted at the moment of page load. These logs show live transmissions as they occur, providing direct proof that the collection is real, continuous, and automatic—not theoretical.

221. Figures 16 through 21 are Fiddler packet-captures showing multiple third-party tracking systems operating on the Website—including Google Analytics and Google Tag Manager, Microsoft Bing Ads, TikTok Analytics, Rubicon/Magnite, The Trade Desk (AdsRvr), and Tapad—collecting routing, addressing, and signaling metadata in real time.

222. Figure 16 shows Tapad receiving a push request containing unique identity-sync parameters and a full Website referrer URL.

/ / /

/ / /

/ / /

***Figure 16***




223. Figure 17 shows The Trade Desk (insight.adsrvr.org) receiving a track/pixel request containing full page URLs, campaign parameters, and device/browser metadata.

***Figure 17***



224. Figure 18 shows Rubicon/Magnite (pixel.rubiconproject.com) receiving a tap.php request containing Rubicon's put identifier and partner nid parameters.

***Figure 18***




225. Figure 19 shows TikTok Analytics (analytics.tiktok.com) receiving a POST payload containing the event type (PageView), timestamp, TikTok pixel_id, TikTok session_id, the _ttp identifier, and full RocketMortgage URL parameters (dl, referrer, and page_location).

/ / /

/ / /

/ / /

/ / /

/ / /

***Figure 19***




226. Figure 20 shows Microsoft Bing Ads (bat.bing.com) receiving a GET request containing Bing's sid, vid, mid, and RocketMortgage's full page URL with campaign tags.

***Figure 20***



227. Figure 21 shows Google receiving a collect request with Google's cid, sid, page title (dt), and RocketMortgage page URL transmitted via the Analytics/Tag Manager pipeline.

***Figure 21***




228. These transmissions also include device-level and environment metadata such as screen resolution, browser version (Chrome/139), and operating system (Windows NT 10.0). Because these Fiddler captures record the exact identifiers, timestamps, browser fingerprints, and routing components transmitted in real time, they provide definitive evidence that Defendant is actively transmitting behavioral and identity-related signaling data to multiple third parties—not hypothetically, but as live traffic occurring during a user's visit.

## VI. CLASS ALLEGATIONS

229. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by

the Defendant's Website during the relevant statute of limitations period.

230. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

231. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether ClassMembers are entitled to disgorgement of data unlawfully obtained; and
- Whether the Defendant's conduct violates CIPA.

232. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

233. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action

litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

234. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

***By Plaintiff and the Class Members Against All Defendants***

235. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

236. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

237. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

238. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative,

and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein;
5. Statutory damages pursuant to CIPA;
6. Prejudgment interest;
7. Reasonable attorney's fees and costs; and
8. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated: December 3, 2025 **NATHAN & ASSOCIATES, APC**

By: /s/ *Reuben D. Nathan*
Reuben D. Nathan, Esq.
Attorneys for Plaintiff